**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

In the Matter of the Care and Treatment of Phillip Byron Nix, Appellant.

Appellate Case No. 2024-001746

Appeal From Lexington County
Walton J. McLeod, IV, Circuit Court Judge

Unpublished Opinion No. 2026-UP-337
Submitted June 1, 2026 – Filed July 1, 2026

**AFFIRMED**

Kindle Kay Johnson, of K. Johnson Law Firm, LLC, of Charleston, for Appellant.

Attorney General Alan McCrory Wilson and Senior Assistant Deputy Attorney General Christopher Runyan, both of Columbia, for Respondent.

**PER CURIAM:** Phillip Nix appeals his involuntary commitment under the Sexually Violent Predator Act (the SVP Act),[1] arguing the circuit court erred by allowing the State's expert to testify to the details of his underlying sexual offenses in violation of Rule 403, SCRE. We affirm.

---

[1] S.C. Code Ann. §§ 44-48-10 to -180 (2018 & Supp. 2025).

**FACTS**

Nix was convicted of two sexually violent offenses in Lexington County in March 2013—second-degree criminal sexual conduct (CSC) with a minor and third-degree sexual exploitation of a minor. He was eventually released on community supervision, which was revoked in March 2022.

Nix's SVP trial took place on August 12-13, 2024. Dr. Emily Gottfried, the Director of the Sexual Behavior Clinic and Lab at the Medical University of South Carolina, testified as the State's expert in clinical and forensic psychology and forensic sex offender evaluations. As part of her evaluation, Dr. Gottfried reviewed police reports and court documents related to Nix's underlying convictions, records from the South Carolina Department of Corrections and the Lexington County Detention Center, and forensic interviews and reports. Nix also underwent testing and a clinical interview at her lab.

Dr. Gottfried explained that she reviewed records regarding the details of Nix's offenses. She testified Nix's daughter (Daughter), who was then twelve years old, reported that Nix had been raping her almost daily for several months, to the point that she was "bleeding and sore." Dr. Gottfried expanded on some of Daughter's statements to investigators, including that Nix told Daughter "she made it easy for him to become aroused because she was so beautiful" and that she "should not be able to make [him] hard." Nix objected to this testimony.[2] Regarding the sexual exploitation charge, Dr. Gottfried testified that the mother of one of the victims found Nix's cell phone, which had pictures of young girls on it, including her own children, in sexually suggestive poses. She described one photo of an eight or nine-year-old girl "exposing her [] breast area." Nix objected to "all of the details" and the circuit court directed the State to "lead the discussion in a little more general place."

Dr. Gottfried also testified about Nix's violation of community release. She stated that Nix had "sexually stimulating and sexually explicit" material on his phone, including multiple screenshots on his cell phone of a nude "adult woman and a two-year-old child."[3] She explained that Nix also failed to complete sex offender treatment and had pornographic websites on his phone.

---

[2] The circuit court held a bench conference, and its ruling was not reported on the record.

[3] Nix objected this to this testimony as well. The circuit court held another bench conference and ultimately overruled the objection.

Dr. Gottfried asserted that the "best predictor of future behavior is looking at what someone did in the past" and explained that she examines the characteristics of an offender's charges and convictions to identify patterns and determine the likelihood that the person will reoffend. She explained that the specifics of Nix's offenses were important in forming her opinion about his risk of reoffending because they helped her "develop an idea or a sense of what made [him] offend" and what he liked about the behaviors. She opined that the circumstances in this case demonstrated that Nix had significant trouble controlling his sexual arousal and behavior. She noted that Nix began offending shortly after his release from prison, in a situation with a high probability of being caught because other people were present and the victims could easily identify him, and he offended nearly every day, even when Daughter was injured and clearly in distress. Additionally, she noted that he began violating the terms of his community supervision program within a few months of his release from prison and the materials found on his phone "were in line with his convictions for sexual offenses," which suggested that those "sexual interests . . . continued . . . even after conviction and punishment and serving a sentence in prison" and further demonstrated his inability to control his behavior.

Dr. Gottfried diagnosed Nix with antisocial personality disorder and cocaine abuse disorder based on his multiple adult and juvenile arrests and convictions for various criminal activity, including sexual offenses; long-term substance abuse; his history of irresponsibility such as failing to make child support payments and repeated violations of probation and conditional release; and his lack of remorse for his offenses, including his tendency to blame others for his actions. She stated antisocial personality disorder is a chronic condition which has not shown any signs of subsiding in Nix. She noted that Nix "lacked insight" into this diagnosis and believed he was not accurately self-reporting in an attempt to "suppress his sexual drive."

Dr. Gottfried further testified that she believed Nix was at "well-above average risk"—the highest risk category—to reoffend because the antisocial personality disorder caused his sexual offense behaviors. She stated the disorder affected his ability to control himself to such an extent that it predisposed him to commit sexually violent offenses, and, in her opinion, Nix would be more likely than not to reoffend if he were not confined. She explained that Nix had several risk factors she considers when assessing a person's likelihood to reoffend. For example, she testified that Nix "has deviant sexual interest preference" and, while on community supervision, he was found in possession of images "that were consistent with the offenses he had been convicted of." She stated he also had risk factors related to

"cooperation with supervision or treatment" because he had numerous disciplinary infractions while incarcerated and probation violations shortly after release, which showed he was unable to control his behavior even in a highly structured environment, and he had not completed sexual behavior treatments and maintained that he did not have any problems with sexual behavior. Dr. Gottfried testified she was also concerned about Nix's lack of a support system because many people in his network had a criminal history, some used drugs and alcohol, and Nix reported that "no one in his support system thinks that he actually committed a sexual offense." Further, Nix's reported plan to avoid reoffending was simply to "just be around adults." She explained that Nix lacked "insight into his risk level, his antisocial personality disorder diagnosis, [and] his sexual arousal to things that are not consensual or age appropriate," specifically noting his repeated insistence that he did not need treatment.

Dr. Christopher Gillen, an evaluator at the South Carolina Department of Mental Health, testified on Nix's behalf as an expert in forensic psychology. He testified that he also diagnosed Nix with antisocial personality disorder. Dr. Gillen stated that in Nix's case, the disorder presents as "rule violating or criminal behaviors that he's engaged in throughout his life," "impulsivity," "recklessness," and "a lack of remorse and . . . not accepting responsibility for . . . [his] wrongdoing." In his first report, issued in January 2023, Dr. Gillen opined that Nix was a sexually violent predator; however, he later changed his opinion and issued a new report in June 2023 opining that Nix did not meet the criteria. Dr. Gillen testified that the statutory definition of "likely to re-offend" changed in May 2023, and based on the new definition, he believed that Nix no longer met the criteria to be considered a sexually violent predator.[4] He explained that the new definition required a finding that a person was "more probably than not or more likely than not to commit sexually violent offenses if they're released," and in his interpretation, "more probably than not" means a likelihood of fifty percent or greater that a certain event will happen. Dr. Gillen testified that based on his assessments of Nix, Nix's five-year risk of reoffending was 16.2% and his lifetime risk was 34%; therefore, he did not believe Nix was "likely to reoffend" pursuant to the statutory definition.

On cross-examination, Dr. Gillen clarified that he did not re-interview Nix or obtain any new evidence or documents, nor did Nix's scores on the risk assessments change from the original evaluation. He agreed that Nix displayed a "pattern" of "sexually deviant behavior" displaying a preference for "minor females" and that Nix "continued to engage in sexually problematic behavior

---

[4] Dr. Gillen did not change his diagnosis of antisocial personality disorder.

despite sanctions."  Dr. Gillen also asserted that Nix's sexual offenses were "related to the antisocial personality disorder," that the disorder was a "mental condition that [] affected his emotional and volitional capacity to engage in acts of sexual violence," and that it "predispose[d] him to engage in such behavior."  He testified Nix was in the "above-average risk" category to reoffend, had not learned any strategies or skills to help him mitigate risk, did not have a well-established support network to hold him accountable, lacked "insight into his sexual preferences," and showed "a limited motivation to change and no commitment to pursue sex offender treatment."  Finally, Dr. Gillen testified he believed Nix "demonstrated a pattern of difficulty controlling his sexual arousal and behavior in the community consistent with volitional impairment due to a predisposing mental condition."

The jury found Nix met the definition of a sexually violent predator under the SVP Act, and the circuit court committed him to the South Carolina Department of Mental Health for "long-term control, care, and treatment."  This appeal followed.

## ISSUE ON APPEAL

Did the circuit court err by allowing the State's expert to testify to the details of Nix's underlying sexual offenses in an SVP commitment hearing in violation of Rule 403, SCRE?

## STANDARD OF REVIEW

"The admission of evidence is within the discretion of the circuit court and will not be reversed absent an abuse of discretion." *Care & Treatment of Ettel v. State*, 377 S.C. 558, 561, 660 S.E.2d 285, 287 (Ct. App. 2008).  "To constitute an abuse of discretion, the conclusions of the [circuit court] must lack evidentiary support or be controlled by an error of law." *In re Manigo*, 389 S.C. 96, 106, 697 S.E.2d 629, 633-34 (Ct. App. 2010), *aff'd*, 398 S.C. 149, 728 S.E.2d 32 (2012).  "In addition, '[a circuit court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances.'" *Matter of Daily*, 443 S.C. 557, 564, 905 S.E.2d 310, 313 (Ct. App. 2024) (quoting *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014)).

## LAW/ANALYSIS

Nix argues that the circuit court erred by allowing Dr. Gottfried's testimony to extend beyond explaining the material used to conduct her evaluation and into

"graphic detailed hearsay" about the details of his underlying offenses in violation of Rule 703 and Rule 403, SCRE, and that this testimony inflamed the jury and unfairly influenced its decision. We disagree.

"Under the SVP Act, the State bears the burden of proving beyond a reasonable doubt that a person is a sexually violent predator." *In re Care & Treatment of Harvey*, 355 S.C. 53, 60, 584 S.E.2d 893, 896 (2003). A "'[s]exually violent predator' means a person who . . . has been convicted of a sexually violent offense" and "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 44-48-30(1)(a)-(b). A "mental abnormality" is "a mental condition affecting a person's emotional or volitional capacity that predisposes the person to commit sexually violent offenses." § 44-48-30(3). "'Likely to engage in acts of sexual violence' means that a person is predisposed to engage in acts of sexual violence and more probably than not will engage in acts of sexual violence to such a degree as to pose a menace to the health and safety of others." § 44-48-30(9).

"[A]n expert witness may state an opinion based on facts not within his or her firsthand knowledge[,]" and "may base his or her opinion on information, whether or not admissible, made available before the hearing if the information is of the type reasonably relied upon in the field to make opinions." *Manigo*, 389 S.C. at 106, 697 S.E.2d at 634. "Additionally, an expert may testify as to matters of hearsay for the purpose of showing what information he or she relied on in giving an opinion of value." *Id.*; *see also* Rule 801(c), SCRE (explaining that hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). "Unless the appellant was prejudiced by the erroneous admission of hearsay, reversal is not required." *Harvey*, 355 S.C. at 62, 584 S.E.2d at 897.

We find Dr. Gottfried's testimony was directly relevant to the issue of whether Nix was likely to reoffend. *See In re Care & Treatment of Corley*, 353 S.C. 202, 207, 577 S.E.2d 451, 454 (2003) (finding the expert's testimony about the details of Corley's past offenses "was directly relevant to the ultimate issue of th[e] case" because she testified "it evince[d] a pattern of behavior which in turn indicates the person would be at an increased risk to commit future offenses"). Although we understand Nix's concern with Dr. Gottfried's testimony, we hold the circuit court did not abuse its discretion by admitting it. *See Ettel*, 377 S.C. at 561, 660 S.E.2d at 287 ("The admission of evidence is within the discretion of the circuit court and will not be reversed absent an abuse of discretion."); *Daily*, 443 S.C. at 564, 905

S.E.2d at 313 (explaining that the circuit court's "decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances" (quoting *Collins*, 409 S.C. at 534, 763 S.E.2d at 28)).

Case law has long established that a person's prior behavior is relevant to the determination of whether that person is a sexually violent predator. *See, e.g.*, *Ettel*, 377 S.C. at 562, 660 S.E.2d at 287 ("Because a 'person's dangerous propensities are the focus of the SVP Act,' consideration of '[p]ast criminal history is therefore directly relevant to establishing [section] 44-48-30(1)(a),' which in turn bears directly on whether one suffers from a mental abnormality under section 44-48-30(1)(b)." (quoting *Corley*, 353 S.C. at 206-07, 577 S.E.2d at 453-54 (second alteration added))). For this reason, experts in SVP cases are "allowed to have 'reasonable access to the person for the purpose of the examination, as well as access to all *relevant* medical, psychological, *criminal offense*, and disciplinary records and reports.'" *Id.* at 561-62, 660 S.E.2d at 287 (quoting § 44-48-90). Moreover, "[t]he expert may base his or her opinion on information, whether or not admissible, made available before the hearing" and "may testify as to matters of hearsay for the purpose of showing what information he or she relied on in giving an opinion of value." *Manigo*, 389 S.C. at 106, 697 S.E.2d at 634. However, "due process does not allow an expert to serve as a 'conduit' for hearsay *without some baseline showing that the hearsay is reliable*." *Matter of Bilton*, 432 S.C. 157, 166-67, 851 S.E.2d 442, 446 (Ct. App. 2020) (emphasis added).

Here, Dr. Gottfried explained that "the best predictor of future behavior is looking at what somebody did in the past" and stated she wanted to "examine the offense characteristics of both charges and convictions of prior sexual offenses that can tell us the likelihood of that happening again, . . . what the offense behaviors might look like, the victim pool, and . . . [to] identify patterns of behavior." She noted that the specific circumstances of Nix's offense showed he had trouble controlling his behavior even in an environment in which he was likely to be caught—i.e., shortly after his release from prison, with a victim who could easily identify him, and even when she was injured and in pain. This testimony also helped explain Dr. Gottfried's diagnosis of antisocial personality disorder, which she testified is characterized by "a pervasive and inflexible disregard for the rules and the safety of others, as well as the rights of other people," "aggressiveness," and "a lack of remorse." Regarding the sexual exploitation charge, Dr. Gottfried explained that the details of the pictures on Nix's phone were important because "[t]ypically you're going to . . . save pictures of things that you're aroused by, things that you like." She also noted that this conduct was similar to the CSC offense. *See Corley*,

353 S.C. at 207, 577 S.E.2d at 454 (approving expert testimony regarding the details of the underlying offenses because the expert explained "that where there is similarity, it is significant because it evinces a pattern of behavior which in turn indicates the person would be at an increased risk to commit future offenses"). Additionally, we find there was a baseline showing that the hearsay was reliable because Dr. Gottfried testified to details of two offenses to which Nix pleaded guilty or, in the case of the screenshots, subsequently admitted to. *See Bilton*, 432 S.C. at 166-67, 851 S.E.2d at 446 ("[D]ue process does not allow an expert to serve as a 'conduit' for hearsay without some baseline showing that the hearsay is reliable.").[5] The screenshots were also admitted into evidence without objection.[6] Thus, we hold the circuit court did not abuse its discretion in allowing Dr. Gottfried to testify regarding the underlying details of Nix's offenses and probation violations.

Further, even if some or all of Dr. Gottfried's testimony was erroneously admitted, the error was harmless and Nix was not prejudiced by it. *See Vaught v. A.O. Hardee & Sons, Inc.*, 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005) ("To warrant

---

[5] *Bilton* does not explain how to determine whether the party offering the hearsay evidence has made a "baseline showing that the hearsay is reliable." 432 S.C. at 164-67, 851 S.E.2d at 445-46. Additionally, we note that *Bilton* dealt with "reliability" in the context of disputed scientific evidence—specifically the "controversial" penile plethysmograph (PPG) test that the supreme court recently clarified is "not sufficiently reliable" enough to be admissible under Rule 702, SCRE. *Id.* at 162, 851 S.E.2d at 444; *Matter of Hyman*, Op. No. 28330 (S.C. Sup. Ct. filed May 13, 2026) (Howard Adv. Sh. No. 18 at 53). Thus, we find the statements at issue in this case are distinguishable and the fact that Nix pled guilty to the charges is sufficient to show the statements, which were part of the State's evidence in the underlying cases, were reliable in this context. *See Sanders v. Leeke*, 254 S.C. 444, 447, 175 S.E.2d 796, 797 (1970) ("A plea of guilty is a confession of guilt . . . ."); *Zurcher v. Bilton*, 379 S.C. 132, 137, 666 S.E.2d 224, 227 (2008) ("[T]he entry of an *Alford* plea at a criminal proceeding has the same preclusive effect as a standard guilty plea.").
[6] Nix admitted he took the screenshots, although he claimed it was an accident. He also called Daughter as a witness, and she confirmed the details of the incident. Thus, Nix cannot complain about prejudice regarding Dr. Gottfried's testimony. *See State v. McGee*, 55 S.C. 247, 249, 33 S.E. 353, 353 (1899) ("[I]t would have been a waiver if the party objecting had afterwards himself introduced similar testimony [when another witness was examined]; for, having received the benefit of such testimony, he would be estopped from objecting to its competency.").

reversal based on the admission . . . of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, *i.e.,* there is a reasonable probability the jury's verdict was influenced by the wrongly admitted . . . evidence."); *Harvey*, 355 S.C. at 62, 584 S.E.2d at 897 ("Unless the appellant was prejudiced by the erroneous admission of hearsay, reversal is not required."); *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) ("Error is harmless when it 'could not reasonably have affected the result of the trial.'" (quoting *State v. Key*, 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971))). First, the details of the offenses were only part of the information Dr. Gottfried relied upon in making her diagnoses and determination that Nix met the criteria of being a sexually violent predator. *See Ettel*, 377 S.C. at 563, 660 S.E.2d at 288 ("As for the testimony's possible prejudice, the [contested evidence] as well as the murder conviction w[as] not the only sources of Dr. Crawford's diagnosis."). She also testified extensively about Nix's long history of criminal activity, the diagnostic testing she performed, and Nix's self-reported symptoms and behaviors. For example, she pointed to risk factors such as a lack of a community support system that would hold Nix accountable, his lack of insight into his antisocial personality disorder diagnosis, his denial of any wrongdoing or need for treatment, and his continued misbehavior and inability to control himself even in highly structured settings such as prison and supervised release. Additionally, Nix's own expert, Dr. Gillen, agreed with essentially all of Dr. Gottfried's conclusions, except his interpretation of the statutory language regarding what "more probably than not" to reoffend means. For example, Dr. Gillen agreed that Nix was in the "above average" risk category to reoffend and that Nix's sexual offenses were "related to the antisocial personality disorder," that the disorder was a "mental condition that [] affected his emotional and volitional capacity to engage in acts of sexual violence," and that it "predispose[d] him to engage in such behavior." Accordingly, we find Nix was not prejudiced by any inadmissible hearsay as there was other substantial evidence to support the jury's finding that Nix was a sexually violent predator and the details of the offenses testified to by Dr. Gottfried "could not reasonably have affected the result of the trial." *Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151 ("Error is harmless when it 'could not reasonably have affected the result of the trial.'" (quoting *Key*, 256 S.C. at 93, 180 S.E.2d at 890)); *see also Harvey*, 355 S.C. at 62, 584 S.E.2d at 897 ("Unless the appellant was prejudiced by the erroneous admission of hearsay, reversal is not required.").

**AFFIRMED.**[7]

---

[7] We decide this case without oral argument pursuant to Rule 215, SCACR.

**THOMAS, MCDONALD, and TURNER, JJ., concur.**